**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.  1:10CR221 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | OPINION AND ORDER |
| | ) | |
| | ) | |
| KEVIN DYE, | ) | |
| | ) | |
| | ) | |
| DEFENDANT. | ) | |

Before the Court are a series of pre-trial motions. Specifically, the Court shall address:

- the defendant's motion to suppress evidence (Doc. No. 45);

- the defendant's motion for a bill of particulars (Doc. No. 61);

- the defendant's motion to dismiss the indictment (Doc. No. 63);

- the defendant's motion for a jury view (Doc. No. 64);

- the defendant's motion to dismiss for fraud  (Doc. No. 65);

- the defendant's motion to suppress evidence (Doc. No. 67); and

- the defendant's motion to dismiss on speedy trial grounds (Doc. No. 68).

The government has responded to all motions. The Court held a hearing on the motions on April 8, 2011, and continuing on April 11, 2011. The Court ruled from the bench on many of the pending motions, and issued a written Order, dated April 11, 2011,

memorializing its bench rulings. (*See* Doc. No. 94.) The Court took the remaining motions under advisement, and is now prepared to issue a ruling on these motions.[1]

**Background**

*The Arson at the Mansfield City Hall*

In the early morning hours of December 14, 2009, an unknown assailant used fire and explosive materials to damage the Mansfield City Hall building in Mansfield, Ohio. Investigators at the scene discovered plastic gallon milk jugs filed with gasoline. A towel had been inserted into the top of the milk jugs and then lit on fire, creating a version of a Molotov cocktail. Duct tape had also been used to construct the devices.

The make-shift incendiary devices did substantial damages to the chambers of Mansfield Municipal Court Judge Payton. At the time of the arson on December 14, 2009, the defendant Kevin Dye had six misdemeanor criminal cases pending against him before Judge Payton. Two of the cases were scheduled for trial before Judge Payton on December 16, 2009, a mere two days after the bombing, and the other four were scheduled for trial before Judge Payton on January 26, 2010. (Doc. No. 71, Ex. 1, State Court Docket.) After state investigators learned of the defendant's connection to Judge Peyton, the defendant became a person of interest in the investigation.

---

[1] Also pending is the Defendant's motion to prohibit "other acts" evidence. (Doc. No. 62.) At the motion hearing on April 11, 2011, the Court granted the government leave to supplement its response to this motion. The government has filed its supplement, and the Court will issue a ruling on this motion after the defendant has had an opportunity to respond to the supplement.

In the hours following the explosion, the police made several attempts to locate the defendant. Investigator Kurt Schneider of the Ohio State Fire Marshal's Office testified at the hearing that he and other law enforcement officials visited a variety of residences in Mansfield, Ohio looking for the defendant. (April 8, 2011 Uncertified Transcript at 51-52.) The first residence visited by Schneider was a Pawnee Avenue address, which the parties agree is the primary residence of the defendant. While there appeared to be several residences where the defendant stayed from time to time, including the home of at least two of his girlfriends, the Pawnee Avenue property was owned by the defendant, and was listed on the defendant's driver's license as his address. (TR at 52.)

When the defendant was not located at the Pawnee Avenue address, Schneider and other officers proceeded to 363 Fairlawn Avenue, which was believed to be the residence of one of the defendant's girlfriends, Laurie Butler.[2] (TR at 57, 60.) At the hearing, the government offered testimony establishing that Ms. Butler owned the Fairlawn property, and that she made mortgage payments on the home on this property. (TR at 59-60.) The evidence further established that the defendant had no ownership interest in the property, and did not make payments toward the mortgage. (TR at 60.)

Finding a red Dodge pickup truck registered to the defendant in the driveway, Schneider approached the Fairlawn residence. Butler answered the door, and Schneider advised her that he and the other officers were looking for the defendant. (TR at 89-90.) After confirming that she was the owner of the property, Butler consented to allowing Schneider to search the home for the defendant. (TR at 90-91.) Schneider did

---

[2] Other officers visited a residence on Delph Street, which was believed to be the residence of another girlfriend. (TR at 53.)

3

not find the defendant, but in plain view he did see a red plastic gasoline container, a roll of duct tape, a plastic milk container in the trash can, and a plastic wrapper from a roll of duct tape. He also noticed a strong odor of gasoline emanating from the kitchen area. (TR at 95, 97.)

After Schneider completed his search of the Butler residence for the defendant, efforts were made to obtain a search warrant for the Fairlawn residence, based, in part, upon the items Schneider had observed at the residence. (TR at 99, 110.) At the same time, Schneider attempted to obtain Butler's consent to search the residence for evidence. Butler indicated to Schneider that she was afraid to affix her signature to any document for fear of bodily harm from the defendant. (TR at 103.) Butler ultimately provided verbal consent to Schneider for the search, but refused to sign a formal written consent. (TR at 106-07.)

On the same morning, Sergeant Joseph Petrycki of the Mansfield Police Department was also one of the law enforcement officers trying to locate the defendant. On the morning of December 14, 2009, he first went to the defendant's residence located at 1164 Pawnee. Eventually, he arrived at Butler's Fairlawn residence. (TR at 70-71.) When he arrived, there were already numerous police officers and federal agents at the residence. (TR at 118.) Butler was sitting in an unmarked car outside the residence. He explained to Butler why law enforcement was present and asked for her verbal consent to search her residence, in response to which she said "yes."[3] (*Id.*) As with Schneider, Butler

---

[3] Butler confirmed her verbal consent to search given on the morning of December 14, 2009 during a videotaped interview with Sgt. Petrycki and Agent Hall conducted at the Mansfield Police Department later that day. (TR at 120-22.)

would not agree to sign a consent form because she was afraid of the defendant and what he might do to her if she did. (TR at 119.) Notwithstanding Butler's verbal consent, Sgt. Petrycki was aware that other officers were in the process of obtaining a search warrant and he decided that he would wait until after the warrant was issued and brought to Butler's residence. (TR at 120.) The search of Butler's residence did not take place until after the search warrant (Gov. Ex. 7) was brought to her residence. (TR at 123, 126.)

While Schneider, Petrycki and others waited at Butler's residence, other officers prepared the search warrant application, which was presented to Judge Konstam of the Richland County Court of Common Pleas. Judge Konstam signed the search warrant. (Doc. No. 73, Ex. 1, Search Warrant.)  At some point prior to the second search, the warrant was delivered to the Fairlawn address. (TR at 115, 123.) During this subsequent search, investigators located and seized numerous items believed to be related to the firebombing, including a sledgehammer with glass fragments on it, gasoline, clothes that smelled strongly of gasoline, duct tape, milk jug lids that had been cut like the ones used in the firebombing, and a towel that matched the same style used in the firebombing. (TR at 95.)

On December 15, 2009, the defendant was arrested by state law enforcement officials, and charged with arson. He was later indicted on February 4, 2010, by a state grand jury in Richland County, Ohio, for violations of state law relating to the arson occurring at the Mansfield City Hall.

*The Original Federal Indictment*

On May 18, 2010, the defendant was indicted by a federal grand jury. (Doc. No. 1, Indictment.) Count 1 of the Indictment charged the defendant with violating

18 U.S.C. § 844(i), the federal arson statute. Count 2 of the Indictment charged the defendant with knowingly carrying and using destructive devices in the commission of a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (c)(1)(B)(ii). Following the filing of the federal Indictment, the state charges were dismissed without prejudice on June 8, 2010.

*The Arson at Belcher's House of Rock and the Superseding Indictment*

On March 30, 2010, the government issued a Superseding Indictment against the defendant. Count 1 of the Superseding Indictment charged the defendant with the August 8, 2009 arson of a bar in Mansfield known as Belcher's House of Rock, in violation of 18 U.S.C. § 844(i). (Doc. No. 83, Superseding Indictment.) Count 2 charged the defendant with the December 14, 2009 arson of the Mansfield City Hall, and Count 3 charged the defendant with using destructive devices in connection with the arson in Count 2.

**Discussion**

*Defendant's Motions to Suppress*

The defendant moves to suppress the fruits of the searches of the Fairlawn residence.[4] Specifically, he claims that the initial entry into the residence was "obtained

---

[4] The defendant has filed two motions to dismiss the Indictment, and by implication, the Superseding Indictment. (*See* Doc. Nos. 45 and 67.) Because there is some overlap in the issues raised in each motion, the Court shall address both motions together.

by the misleading claim that officers wanted to determine whether Mr. Dye was present. In fact, the purpose of the initial entry was to search the premises for evidence." (Doc. No. 67 at 4.) The Court begins by noting that, in reviewing the defendant's motion, the facts must be viewed in a light most favorable to the government. *United States v. Wellman*, 185 F.3d 651, 654-55 (6th Cir. 1999); *United States v. Williams*, 962 F.2d 1218, 1221 (6th Cir. 1992); *United States v. Oliver*, 126 F. Supp. 2d 495, 500 (S.D. Ohio 2000).

The Fourth Amendment states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend IV.

The controlling standard of the Fourth Amendment is reasonableness. *See Katz v. United States*, 389 U.S. 347, 357 (1967). Because the Fourth Amendment guarantees the right to be free from unlawful searches and seizures, a police officer's entry into a home without a warrant is presumptively unreasonable under the Fourth Amendment. *Payton v. New York*, 445 U.S. 573, 586 (1980); *O'Brien v. City of Grand Rapids*, 23 F.3d 990, 996 (6th Cir. 1994).

<u>Standing</u>

While the government argues that the initial warrantless search of the Fairlawn residence was both reasonable and falls within an exception to the general rule prohibiting warrantless searches, it initially suggests that the defendant does not have standing to challenge either search. Standing to challenge a search hinges on whether a

defendant had a reasonable expectation of privacy in the residence. *United States v. Washington*, 573 F.3d 279, 282 (6th Cir. 2009). To establish such an expectation, the defendant must show (1) that he had a subjective expectation of privacy, and (2) that his expectation was objectively reasonable. *United States v. Pollard*, 215 F.3d 643, 647 (6th Cir. 2000). An expectation is objectively reasonable only when it is one that "society is prepared to recognize as legitimate." *Id. See Smith v. Maryland*, 442 U.S. 735, 740 (1979). "A 'defendant claiming that a search violated Fourth Amendment rights has the burden of demonstrating that he had a legitimate expectation of privacy in the place that was searched.'" *United States v. Mastromatteo*, 538 F.3d 535, 544 (6th Cir. 2008) (quoting *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001)).

The defendant argues that he had a reasonable expectation of privacy in the Fairlawn residence, as evidenced by the fact that his vehicle was parked in the driveway of the premises, and his personal mail was found inside the premises.[5] He also points to evidence that he had, on occasion, resided at Butler's home, and, on the night of his arrest, had on his person keys that unlocked various locks at the Fairlawn residence. (TR at 75.) In fact, at the hearing on the motion, defense counsel underscored the fact that police officers went to the Fairlawn residence because they believed that they might find the defendant there. (TR at 46, 89.) Finally, the defendant notes that a 2009 "Recognizance of Accused on Adjournment," issued in the defendant's state court

---

[5] At the hearing, defense counsel indicated that Mr. Dye had "received mail" at the Fairlawn residence. (TR at 44.) The record revealed, however, that the mail in question, a tax bill, though found inside Butler's home, was addressed to the defendant at the Pawnee address. (Motion to Suppress, Gov. Ex. 11; TR at 6-64.)

domestic violence case, listed the Fairlawn address and telephone number.[6] (*See* Motion to Suppress, Gov. Ex. 1, No Contact Order.)

A place to be searched need not be the defendant's home in order for the defendant to have a legitimate expectation of privacy. *United States v. Whitehead*, 415 F.3d 583, 587 (6th Cir. 2005). This is because the Fourth Amendment protects people, not places. *Id.* Moreover, "[t]he Sixth Circuit has construed the Fourth Amendment as protecting nearly all overnight guests, even when the guest occupies a common area in the apartment that is not private from other residents." *United States v. Lewis*, 672 F. Supp. 2d 827, 834 (S.D. Ohio 2009) (citing *Washington*, 573 F.3d at 283).

The government does not dispute that the defendant had ties to the residence, possessed keys to the residence, and that his personal possessions were found at the Fairlawn residence. (TR at 81-82.) Nor does it contest evidence demonstrating that the defendant had stayed, on occasion, at the Fairlawn address. Nonetheless, the government argues that the defendant did not have a reasonable expectation of privacy in the Fairlawn residence because, *at the time of the search,* there was a protection order in place, issued in connection with the defendant's criminal domestic violence case, which prohibited the defendant from having any contact with Laurie Butler. (*See* Gov. Ex. 1.)

In *Commonwealth v. Morrison*, 429 Mass. 511 (1999), the Supreme Judicial Court of Massachusetts considered whether a defendant had a reasonable expectation of privacy in his girlfriend's home when there was a pending protection order

---

[6] It is unclear whether this reference is to the defendant's address, as the caption of the document lists the defendant's address as "827 Delph Avenue, Mansfield, OH 44906." (*See* Gov. Ex. 1.)

prohibiting him from being at her home. In that case, the court held there was not a reasonable expectation of privacy:

> Although an overnight guest in general may have such an expectation of privacy in the premises as society is prepared to recognize as reasonable, this overnight guest did not. The defendant in this case was the subject of a protective order forbidding his presence on the very premises in which he claims that society should recognize his right to quiet enjoyment. And on the strength of that order he had, just a short time before, been ordered by the police to stay away from that very place. It is simply nonsense to say that society is prepared to recognize his right to be where society by the processes of the law has ordered him not to be.

*Id.* at 514. *See also United States v. Rambo*, 789 F.2d 1289, 1296 (8th Cir. 1986) ("Rambo cannot assert an expectation of being free from police intrusion upon his solitude and privacy in a place from which he has been justifiably expelled.")

While not binding, the Court finds the decision in *Morrison* to be instructive. It seems incredible that the defendant could maintain that he had a reasonable expectation of privacy in the home of a person with whom he had been ordered by the court to have no contact. At the motion hearing, defense counsel attempted to distinguish this persuasive authority on the ground that the protective order in this case did not prohibit the defendant from being present at the Fairlawn property, rather it merely prohibited contact with Ms. Butler. Counsel further noted that, even if this prohibition effectively meant that the defendant must not enter the Fairlawn property, "[t]he inability to be present at that point in time, [… did not] change the fact that that's still his residence." (TR at 45.) The fact remains, however, that the protection order prohibited contact with the owner of the Fairlawn residence, who resided at the Fairlawn residence with her son. Because the defendant's presence in the Fairlawn residence was likely to bring him in contact with the subject of the no contact order, he was prohibited from

being at the residence; this is particularly so because Butler was at the residence at all times relevant to the search. The Court therefore finds that, at the time of the search, the defendant did not have a reasonable expectation of privacy that society is prepared to recognize. As such, the defendant lacks standing to challenge the search.

<u>Consent</u>

The government argues, however, that even if the defendant did have standing, the search was valid under an exception to the Fourth Amendment's prohibition on warrantless searches. The prohibition against a warrantless entry into a person's home does not apply where voluntary consent has been obtained either from the individual who owns the property or from a third party who possessed common authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) ("[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."); *Shamaeizdadeh v. Cunigan*, 338 F.3d 535, 547 (6th Cir. 2003).

"When seeking to justify a search based on consent, the government has the burden of showing by a preponderance of the evidence that the consent was 'freely and voluntarily given,' and was not the result of coercion, duress, or submission to a claim of authority." *United States v. Bueno*, 21 F.3d 120, 126 (6th Cir. 1994) (quoting *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)). The determination of whether consent was entered into freely and voluntarily is "a question of fact to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227; *Wellman*, 185 F.3d at 656-57.

Investigator Schneider testified that, upon arriving at the Fairlawn residence, he spoke with Butler, who told Schneider that she was the owner of the residence. (TR at 59.) Schneider requested permission to search the premises for the defendant, and Butler consented to this limited search. (TR at 91.) Schneider testified that he did not threaten Butler, that she did not appear to be under the influence of any drugs or alcohol, and that there was nothing to indicate that Butler did not understand the nature of his request. (*Id.*) A tape recorded conversation between Schneider and Butler confirmed that Butler consented to the search and that the search was for the purpose of determining whether the defendant was on the premises.[7]

While the defendant suggests that Investigator Schneider threatened Butler with the removal of her son from her custody, Schneider testified that he made no such threat. (TR at 100.) He further testified that, at no time while he was on the Fairlawn premises, did he threaten Butler in any way. (TR at 102.) The Court finds Investigator Schneider to be credible, and his testimony to be believable. Based upon the totality of the circumstances, the Court finds that the government has established by a preponderance of the evidence that valid consent was freely and voluntarily given by the owner of the premises to justify the warrantless search.

Plain View

Having obtained the owner's consent to search, Investigator Schneider testified that he entered Butler's residence, where he observed in plain view several items

---

[7] Investigator Schneider testified that, as a part of his duties as a law enforcement officer, he often tape recorded such conversations. (TR at 92; *see* Motion to Suppress, Gov. Ex. 2, Tape Recording.) Additionally, during a videotaped interview at the police station with Sgt. Petrycki, Butler confirmed that she consented to the search. (Gov. Ex. 4.)

he believed were connected with the Mansfield City Hall bombing, including duct tape, plastic milk jugs, and a gasoline can. (TR at 95.) "It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." *Coolidge v. New Hampshire*, 403 U.S. 443, 465 (1971). For the police to conduct a valid plain view search, two requirements must be met: "(1) the incriminating nature of the item in plain view must be 'immediately apparent,' and (2) the officer must be lawfully located in a position from which he or she can plainly see the item and have lawful access to it." *United States v. Bradshaw*, 102 F.3d 204, 211 (6th Cir. 1996) (quoting *Horton v. California*, 496 U.S. 128, 136-37 (1990); *see United States v. Riascos-Suarez*, 73 F.3d 616, 625 (6th Cir. 1996), abrogated on other grounds by *Muscarello v. United States*, 524 U.S. 125 (1998), ("A search and seizure is valid if an officer sees an incriminating object while lawfully standing in an area from which the object is plainly visible."))

Based upon the foregoing, the Court finds that Investigator Schneider's discovery of the previously identified items was valid under the plain view exception to the warrant requirement of the Fourth Amendment. First, the incriminating nature of the items was immediately apparent. Investigator Schneider testified that the duct tape, gasoline can, and plastic milk jug were immediately visible without moving anything. (TR at 97.)[8] He also testified that, as he entered the residence, he detected an order of gasoline. (TR at 97.) He further testified that he was aware that similar items had been found at the scene of the Mansfield City Hall bombing, and that such items had been used

---

[8] Specifically, Investigator Schneider testified that the gasoline can, which was located in the foyer, was "partially obstructed by the door, but not that you couldn't see it." (TR at 97; Gov. Ex. 5, Picture of foyer.) He also testified that he saw the duct tape on a kitchen counter. (TR at 98; Gov. Ex. 6, Picture of kitchen.) In addition, he testified that he observed a plastic milk container in a trash can. (TR at 95.)

13

to create the incendiary devices used in the bombing, making the incriminating nature of these items apparent. (TR at 96.)

Next, Investigator Schneider was lawfully in a position to view these items and to have access to them. As previously determined, the owner of the property had given Investigator Schneider permission to search the residence for the defendant. Such a search would have lawfully included the search of any room or area in which the defendant could have been hiding, including the kitchen and foyer. Because the incriminating nature of the items seized was immediately apparent, and Investigator Schneider was lawfully in a place where he could have viewed the items in plain view, the Court finds that the government has established by a preponderance of the evidence that Investigator Schneider's discovery of these items falls under the plain view exception.

<u>The Search Warrant</u>

The plain view discovery of the duct tape, plastic milk jug, and gasoline can led to the issuance of a search warrant for the Fairlawn residence, and a second search of the residence. The defendant challenges this second search on the grounds that the search warrant was overly broad, and that it was not issued by a neutral and detached magistrate.[9]

Items to be seized pursuant to a search warrant must be described with particularity "to prevent 'the seizure of one thing under a warrant describing another' in

---

[9] The record shows that Butler eventually gave verbal consent for officers to conduct a second search of her residence for evidence associated with the bombing, though she was unwilling to sign a consent form because she feared retribution from the defendant. (TR at 106-07, 115, 118, 122 and 127.) While this verbal consent would have been sufficient to justify the second search of the premises, the Court will, in an abundance of caution, address the defendant's challenges to the search warrant.

violation of the Fourth Amendment." *United States v. Wright*, 343 F.3d 849, 863 (6th Cir. 2003) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)). However, "the degree of specificity in a warrant must be flexible, depending upon the type of items to be seized and the crime involved." *United States v. Blair*, 214 F.3d 690, 697 (6th Cir. 2000) (citations omitted). Further, officers may seize items that are not specifically listed but are reasonably related to the offense that formed the basis for the warrant. *Wright*, 343 F.3d at 863.

Here, the warrant authorized the officers to search for and seize:

1. Duct tape
2. Electrical Tape
3. Plastic Bottles
4. Gasoline
5. Any tools or chemical components associated with the manufacturing of explosive devices.
6. Any and all evidence associated with the criminal offense of manufacturing of explosive devices.

(Motion to Suppress, Gov. Ex. 7, Warrant with Affidavit.) The defendant argues that this description is overbroad because of its reference to "any tools" and "any and all evidence associated with the criminal offense of manufacturing of explosive devices."

However, the warrant in question lists several specific items described (including tools, chemical compounds, and any other evidence relating to the manufacture of explosives), which all related back to items already found at the scene and commonly used in making bombs. The Court finds that the items to be seized are listed with sufficient particularity, given the crime involved and given the fact that there are many different ways to construct a bomb. Of course, even if the warrant was overbroad, the remedy would be to excise those items resulting from the overbreadth,

15

rather than to invalidate the entire warrant. *See United States v. Greene*, 250 F.3d 471, 477 (6th Cir. 2001) (internal citation omitted) ("infirmity due to overbreadth does not doom the entire warrant; rather, it 'requires the suppression of evidence seized pursuant to that part of the warrant […], but does not require the suppression of anything described in the valid portions of the warrant (or lawfully seized -- on plain view grounds, for example – during their execution).'") The defendant does not, however, even suggest that any particular items were unlawfully seized as a result of the alleged overbreadth of the search warrant.

The defendant also challenges the neutrality of the judge issuing the search warrant. Specifically, the defendant argues that because the defendant was suspected of bombing "court offices in Richland County and because of the Defendant's prior involvement with the Richland County judicial system, a Richland County judge cannot be considered a neutral and detached party as is required when issuing a search warrant." (Doc. No. 45 at 5.)

In *Shadwick v. Tampa*, the Supreme Court explained that to satisfy the Fourth Amendment, "an issuing magistrate must meet two tests. He must be neutral and detached, and he must be capable of determining whether probable cause exists for the requested arrest or search." *Shadwick*, 407 U.S. 345, 350 (1972).

In the present case, there is nothing in the record that would lead this Court to question the issuing magistrate's impartiality simply because the bombing involved court offices in Richland County and the judge resided in the same county. The issuing judge was not involved in some way in the actual investigation, nor did he otherwise have a personal interest in the matter. *Compare Lo-Ji Sales, Inc. v. New York,*

16

442 U.S. 319, 327 (1979) (judicial officer not acting as neutral and detached manner when he participated in general search of premises with police.) The defendant points to no other evidence that would suggest that any allegiance to the county in which he served as a judge rendered him incapable of being neutral and detached.[10] Likewise, the defendant points to no authority that would call into question the issuing judge's neutrality based solely upon the defendant's prior involvement in the judicial system in Richland County.[11]

In sum, the Court finds no basis to invalidate either search of the Butler residence. The defendant's motions to suppress fruits of these searches, therefore, are DENIED.

Cell Phone Records

The defendant also seeks to suppress his cell phone records, which were obtained via subpoena. However, there is no reasonable expectation of privacy in cell phone records, *Smith*, 442 U.S. at 744, or in cell site location information. *See United States v. Benford*, 2010 U.S. Dist. LEXIS 29453, *4 (N.D. Ind. Mar. 26, 2010); *United States v. Suarz-Blanca*, 2008 U.S. Dist. LEXIS 111622, *18-*19 (N.D. Ga. Mar. 26, 2008). As such, the Court finds the defendant's objection to this evidence to be without merit. Thus, the defendant's motions to dismiss, as they relate to cell phone records, are also DENIED.

---

[10] The government notes that while the issuing judge was a Richland County Court of Common Pleas judge, the building bombed was not a county building. Instead, it was a building owned by the City of Mansfield, Ohio (TR at 124-25); thus further removing the issuing magistrate from the specific facts of the crime in question.

[11] In fact, courts have upheld the issuance of a search warrant by a judge involving a defendant the judge had personally represented in a previous criminal case. *See United States v. Guthrie*, 184 Fed. Appx. 804, 807 (10th Cir. 2006).

*Defendant's Motion for a Bill of Particulars*

The defendant seeks a bill of particulars that would set forth "with particularity, the nature of the charges and/or offenses as to each count, the conduct, the method, manner, and or the means of each essential element […]." The government denies that the defendant is entitled to this relief.

Rule 7(f) provides for the filing of a request for a bill of particulars. Fed. R. Crim. P. 7(f). "The function of a bill of particulars is 'to minimize surprise and assist [the] defendant in obtaining the information needed to prepare a defense and to preclude a second prosecution for the same crimes.'" *United States v. Crayton*, 357 F.3d 560, 568 (6th Cir. 2004) (quoting *United States v. Salisbury*, 983 F.2d 1369, 1375 (6th Cir. 1993)). "Thus, the test in ruling on a motion for a bill of particulars is whether providing such details is necessary to the preparation of the defense and avoidance of prejudicial surprise." *United States v. Musick*, 291 Fed. Appx. 706, 723 (6th Cir. 2008). *See United States v. Matos-Peralta*, 691 F. Supp. 780, 791 (S.D.N.Y. 1988) ("The ultimate test must be whether the information sought is necessary, not whether it is helpful.")

"A bill of particulars 'is not meant as a tool for the defense to obtain detailed disclosure of all evidence held by the government before trial[,]'" *Crayton*, 357 F.3d at 568 (quoting *Salisbury*, 983 F.2d at 1375), nor may a defendant use a bill of particulars to discover the government's legal theory of the case. *United States v. Gabriel*, 715 F.2d 1447, 1449 (10th Cir. 1983); *United States v. Marks*, 364 F. Supp. 1022, 1030 (E.D. Ky. 1973), aff'd, 520 F.2d 913 (6th Cir. 1975), rev'd on other grounds,

18

430 U.S. 188 (1977). Ultimately, the decision to require a bill of particulars is left to the discretion of the trial court. *See Musick*, 291 Fed. Appx. at 723; *United States v. Perkins*, 994 F.2d 1184, 1190 (6th Cir. 1993).

Specifically, the defendant appears to be looking for more information regarding the incendiary devices described in Count 3 of the Superseding Indictment. (TR at 37.) The government argues that the bill is unnecessary because the Superseding Indictment provides more detail regarding these devices than is even necessary by describing them as "composed of gallon size plastic containers containing flammable liquid and a wick, which devices functioned as improvised incendiary weapons […]." (Superseding Indictment at Count 3.)

Here, Count 2 of the Superseding Indictment alleges that the defendant maliciously damaged a building used in interstate or foreign commerce by means of fire and explosive materials, in violation of 18 U.S.C. § 844(i) (federal arson statute.) In addition to setting forth the elements of the offense, Count 2 identifies the date on which the crime took place and the address of the building involved. Count 3 alleges that the defendant used a firearm or destructive devices during the commission of a violent crime, in violation of 18 U.S.C. § 924(c)(1)(A) and (c)(1)(B)(ii). Count 3 also alleges that the defendant used fire and explosive materials, compromising of "gallon size plastic contains containing flammable liquid and a wick" and that these containers functioned as "incendiary weapons." The information contained in these two counts is sufficient to adequately apprise the defendant of the crimes alleged, along with the conduct, method, manner and means allegedly used to commit these offenses. With respect to discovery, the defendant has also been provided with the ATF report regarding these devices, as

19

well as photographs of these devices taken at the scene. As such, there is nothing more that the defendant needs to avoid prejudicial surprise at trial, and a bill of particulars is unnecessary. *See Maltos-Peralta*, 691 F. Supp. at 791. In addition, the Superseding Indictment is sufficiently detailed to ensure that the defendant will not be twice prosecuted for the same offenses. *See United States v. Ridley*, 199 F. Supp. 2d 704, 708 (S.D. Ohio 2001) (indictment sufficiently detailed to overcome double jeopardy concerns).

For all of these reasons, the defendant's motion for a bill of particulars is DENIED.

### *Defendant's Motion to Dismiss the Indictment*

By this motion, the defendant raised several challenges to the sufficiency of the Indictment. While the motion was directed to the original Indictment, it is the defendant's position that these deficiencies were not cured by the Superseding Indictment. The Court will address each argument, in turn.

### <u>Issue One</u> (Insufficiency of Essential Elements)

The defendant first claims that the Indictment is insufficient because it fails to state certain essential elements. Rule 7(c)(1) of the Federal Rules of Criminal Procedures requires that the indictment be a "plain, concise, and definite written statement of the essential facts constituting the offense charged." It need only contain those facts and elements necessary to inform the accused of the charge so that he may prepare a defense, *see Williams v. Haviland*, 467 F.3d 527, 535-36 (6th Cir. 2006), and protect against double jeopardy. *See United States v. Douglas*, 398 F.3d 407, 413 (6th Cir. 2005).

20

18 U.S.C. § 844(i) "makes it a federal crime to damage or destroy, 'by means of fire or explosive, any . . . property used in interstate or foreign commerce or in any activity affecting interstate or foreign commerce.'" *United States v. Singletary*, 268 F.3d 196 (3d Cir. 2001) (citing 18 U.S.C. § 844(i)). Count 1 of the Indictment (Count 2 of the Superseding Indictment) alleges that the defendant maliciously damaged or attempted to damage the Mansfield City Hall by means of fire or explosive materials. It further alleges that the building was used in interstate commerce, and provides the date and location of the building and the statutory provision in question. All of the elements of § 844(i) are present, and the specific date of the offense and the address (of the building) eliminate the possibility of being twice convicted for the same offense.

Further, while the defendant complains that the Indictment does not state that the two counts (Counts 2 and 3 of the Superseding Indictment) are talking about the same arson, indictments are given a common-sense construction. *See United States v. McAuliffe*, 490 F.3d 526, 532 (6th Cir. 2007) (fact reasonably inferred from plain reading of the indictment). Here, the (original) indictment only refers to one arson, both counts identified the same date, and the only address identified anywhere in the Indictment is the Mansfield City Hall. A plain reading is that both counts (or Counts 2 and 3 of the Superseding Indictment) refer to the same arson.[12] As such, the Court finds that this sufficiency argument is without merit.

---

[12] Counts 2 and 3 of the Superseding Indictment both identify events that occurred "[o]n or about December 14, 2009" and are, therefore, referring to the same arson. Count 1 refers to events that occurred "[o]n or about August 8, 2009" and is, therefore, referring to a different arson.

<u>Issue Two</u> (Expert Opinion)

The defendant also complains that an FBI agent improperly gave his expert opinion as to an ultimate issue: namely, that the bombs used in the Mansfield City Hall bombing constituted "destructive devices" under § 924(c)(1)(A)(B)(ii), under Count 2 of the Indictment (Count 3 of the Superseding Indictment). Rule 704, however, allows for an expert to testify as to an ultimate issue so long as the opinion testimony does not relate to "whether the defendant did or did not have the mental state or condition constituting an element of the crime charged or a defense thereto." Fed. R. Crim. P. 704. The Advisory Notes indicate that, among other things, the evidence must be helpful.

Here, expert opinion testimony on the nature of the bomb in question would have been helpful to a lay grand jury unfamiliar with such devices, and did not go to the defendant's mental state. *Compare and contrast* the defendant's cited case: *United States v. Felak*, 831 F.2d 794 (8th Cir. 1987) (expert opinion properly excluded because the jury did not need to hear expert testimony as to the element of willfulness). Because the federal grand jury could properly rely upon the FBI agent's testimony as to destructive devices, the Court rejects this attack upon the Indictment.

<u>Issues Three and Six</u> (Multiplicity and Double Jeopardy)[13]

In his third and sixth issues, **the defendant argues that the Indictment is**

---

[13] At the motion hearing on April 11, 2011, counsel for the defendant indicated that the defendant wished to present his third and sixth issues without the assistance of counsel because he and his counsel did not agree as to the procedure for presenting these two issues to the Court. While the defendant wished to raise the issues of double jeopardy and multiplicity at this time, counsel did not agree with this tactic. In light of this unique dilemma, the Court permitted the defendant to argue, on his own behalf, these two issues. Because counsel for defendant indicated that Issues Three and Six were related—both going toward the same Double Jeopardy argument--the Court will address both issues together. (April 11, 2011 Uncertified Transcript at 5.)

multiplicitous because the "destructive devices" identified in Count 2 (Count 3 of the Superseding Indictment) are the same incendiary weapons that are the critical ingredient in Count 1's arson charge (Count 2 of the Superseding Indictment), and that both counts involved the same course of conduct. The government concedes that the crime of violence identified in Count 2 of the original Indictment is the arson of Count 1, but insists that Congress intended that there be separate punishment for crimes under 18 U.S.C. § 844(i) and § 924(c)(1).

"'Multiplicity' involves charging the same criminal offense in two or more counts of an indictment or information." *United States v. Ragland*, 3 Fed. Appx. 279, 284 (6th Cir. 2001). Multiplicity may result in a defendant being punished twice for the same crime, or may unfairly suggest that more than one crime has been committed. *United States v. Swafford*, 512 F.3d 833, 844 (6th Cir. 2008). To determine whether multiplicity exists, "a court must first look to 'whether Congress intended to punish each statutory violation separately.'" *Id*. (internal citation omitted). "Where this inquiry does not resolve the issue, 'the general test for compliance with the double jeopardy clause looks to 'whether each provision requires proof of a fact which the other does not.'" *Id.* (internal citation omitted). *See Blockburger v. United States,* 284 U.S. 299, 314 (1932); *United States v. Davis*, 306 F.3d 398, 417 (6th Cir. 2002).

Defendant cites *United States v. Swapp*, 719 F. Supp. 1015 (D. Utah 1989), as support for the proposition that Congress did not intend separate punishments under §§ 844(i) and 924(c)(1). However, *Swapp* was reversed on appeal. In ruling that the trial court erred in not sentencing the defendant under § 924(c)(1), after imposing a sentence under § 844(i), the court held that:

23

> [w]here, as here, a legislature specifically authorizes cumulative punishments under two statutes, regardless of whether those two statutes proscribe the 'same' conduct under *Blockburger*, a court's task of statutory construction is at an end and the prosecutor may seek and the trial court or jury may impose cumulative punishment under such statutes in a single trial.
>
> Inasmuch as Congress specifically directed cumulative punishment under § 924(c), the district court was, following Addams conviction under Count II [federal arson], obligated to sentence him to an additional five years imprisonment, without probation to run consecutively with his other terms of imprisonment.

*United States v. Swapp*, 1990 WL 299279, *16 (10th Cir. Sept. 26, 1990). In so ruling, the court specifically took note of the fact that, under 18 U.S.C. § 924(c)(1), the explosive used to bomb the stake house was a "firearm" and that the bombing of the stake house constituted an "act of violence." *Id.* at *16.

Others courts, including the Sixth Circuit (in an unpublished decision), have concluded that Congress intended multiple punishments for violations of §§ 844 and 924. *See United States v. Kirkpatrick*, 1998 WL 869978, *7 (6th Cir. Dec. 1, 1998) ("Congress clearly intended 18 U.S.C. § 924(c) to provide cumulative punishment for persons convicted under other statutes (here involving § 844(i))."); *United States v. McMasters*, 90 F.3d 1394, 1401 n.4 (8th Cir. 1996) (no double jeopardy where indictment charged federal arson and carrying destructive device, noting that the actual use of fire [or an explosive device] is not a requirement of § 844(i) but is of § 924(c)); *United States v. Mathews*, 36 F.3d 821, 823 (9th Cir. 1994) (same—bombing). Because there is sufficient evidence that Congress intended separate punishments for violations of §§ 844(i) and 924(c), the defendant's double jeopardy arguments must fail.

<u>Issue Four</u> (Duplicity)

The defendant also claims that the Indictment, and by implication the Superseding Indictment, is duplicitous. While the defendant's duplicity argument is far from clear, it seems that he is complaining that there are different definitions for the term "explosive or incendiary device" in 18 U.S.C. § 232(5), and "destructive device" in 18 U.S.C. § 924(c)(1)(B)(ii).

"An indictment is duplicitous if it sets forth separate and distinct crimes in one count." *United States v. Davis*, 306 F.3d 398, 415 (6th Cir. 2002). "As rules of pleading, the defects of duplicity and multiplicity are not fatal to an indictment but may be cured by reformulation. In determining whether there is duplicity or multiplicity the decisive criteria are legislative intent and separate proof. When legislative intent is ambiguous, the rule of lenity prescribes that doubt will be resolved against turning a single transaction into multiple offenses. […] Courts rejecting duplicity challenges to multiple-predicate counts, however, often premise their rulings on the condition that later augmented jury instructions will adequately protect the defendant against the risk of nonunanimous verdict." *United States v. Duncan*, 850 F.2d 1104, 1108, n.4 (6th Cir. 1988). *See United States v. Kakos*, 483 F.3d 441, 443 (6th Cir. 2007) ("Proper jury instructions can mitigate the risk of jury confusion and alleviate the doubt that would otherwise exist as to whether all members of the jury had found the defendant guilty of the same offense.")

The ban against duplicitous indictments is premised on four primary concerns: first, the indictment may fail to give defendants adequate notice of the nature of the charges against him; second, it may subject the defendant to prejudicial evidentiary

rulings; third, it may result in an inadequate trial record to protect against subsequent prosecution for the same offense; and fourth, such indictment presents a risk that the jury may have convicted a defendant by a nonunanimous verdict. *United States v. Kimberlin*, 781 F.2d 1247, 1250 (7th Cir. 1985). *See Kakos*, 483 F.3d at 443.

None of the duplicity concerns are present here. As previously determined, the Indictment (and the Superseding Indictment) is sufficient to adequately apprise the defendant of the nature of the charges against, and guard against being twice prosecuted for the same offense. Moreover, the use of multiple definitions does not, in any way, detract from this appraisal. Similarly, there is no evidence that the use of these similar terms will result in prejudicial evidentiary rulings. Finally, because the use of these similar definitions does not result in the allegation of multiple crimes within any one count, there is no risk that the jury may convict on a single count by a nonunamious verdict. *See United States v. Kimberlin*, 781 F.2d 1247, 1250 (7th Cir. 1985). *See Kakos*, 483 F.3d at 443.[14] The defendant's challenge on duplicity grounds, therefore, is without merit.

<u>Issue Five</u> (Definition of "Destructive Device")

In a related argument, the defendant complains that the definition of "destructive device" in Count 2 of the Indictment (Count 3 of the Superseding Indictment) is legally insufficient because the Indictment's definition is inconsistent with

---

[14] Even if duplicitous, the Superseding Indictment can be cured by an augmented unanimity instruction. *See United States v. Damrah*, 412 F.3d 618, 622-23 (6th Cir. 2005) (duplicitous indictment cured by jury instruction); *United States v. Starks*, 472 F.3d 466, 471 (7th Cir. 2006) (duplicitous indictment cured by jury instructions and special verdict form). For this additional reason, dismissal on duplicity grounds is unnecessary.

the factual allegations in this case. The defendant, however, fails to explain why the factual allegations belie the Indictment's finding of the use of a destructive device.

In Count 2 of the Indictment, the term "destructive device(s)" is defined as "gallon size containers containing flammable liquid." This definition is legally sufficient because it describes a "Molotov cocktail," which is a destructive device under 18 U.S.C. § 921(a)(4). *See United States v. Franklin*, 298 Fed. Appx. 477, 479 (6th Cir. 2008) (jury instruction that a Molotov cocktail was a destructive device as a matter of law was not an abuse of discretion); *United States v. Cruz*, 270 Fed. Appx. 393, 396 (6th Cir. 2008) (quoting the Oxford English Dictionary definition of Molotov cocktail: "A makeshift incendiary device for throwing by hand, consisting of a bottle or other breakable container filled with a flammable liquid and with a piece of cloth, etc., as a fuse.") Reliance upon this description of a destructive device, therefore, cannot justify the dismissal of the Superseding Indictment.

Because the Court finds that the Superseding Indictment is legally sufficient, the defendant's motion to dismiss on grounds of insufficiency is DENIED.

*Defendant's Motion for a Jury View*

The defendant requests permission for the jury to view the scene of the December 14, 2009 bombing of the Mansfield City Hall. The defendant claims that only an actual view, as opposed to a review of photographs, will give the jurors "a clear feel and unambiguous view and understanding of how the scene appears," emphasizing that this a complex case. (Doc. No. 64 at 2.) The government opposes such a view, arguing that photographs taken at the scene would be sufficient, and noting that all of the damage

to the Mansfield City Hall has since been repaired. It also underscores the fact that a jury view at the time the crime is alleged to have occurred--the middle of the night--would be inconvenient to the Court and the jury, and that it would be difficult to ensure that all of the conditions at the time of the view are the same as they were at the time the crime was committed.

The decision to permit a jury view is "highly discretionary," *United States v. Triplett*, 195 F.3d 990, 999 (8th Cir. 1999); *United States v. Cochiere*, 129 F.3d 233, 236 (1st Cir. 1997), and a district court does not abuse its discretion in denying such a request where evidence, such as photographs, maps and testimony adequately describe the scene for the fact finder. *See United States v. Moonda*, 347 Fed. Appx. 192, 202 (6th Cir. 2009).

The Court finds that coordinating and conducting a jury view of a scene approximately sixty (60) miles from Akron, Ohio, where the trial is scheduled to be held, would be exceedingly difficult, and would have the effect of lengthening the trial by at least one full day. Further, conducting such a view during the day would be misleading to the jury as the conditions of the view would not replicate those at the time of the offense. *See Moonda*, 347 Fed. Appx. at 202 (concern that daytime view would result in a jury view of "an environment different than the one at the time of the murder"). Conducting a view in the middle of the night would create its own complications, and would inconvenience the jury, the parties, witnesses, and counsel. Moreover, even a night-time view would be unlikely to sufficiently approximate the conditions existing on December 14, 2009, as the view would take place in the spring (May of 2011).

28

The defendant has already been provided with photographs of the scene taken by investigators the night of the arson, showing the damage to the windows inside the building. He is also free to present his own photographs of the scene, or take video to show the area around the building and the traffic and other conditions generally occurring at the time of the bombing. Toward that end, the Court notes that it has previously approved funds for an investigator, who could assist in securing such photographs and video. The Court finds that such photographs and/or video footage will give the jury an adequate picture of the scene, making an on-site jury view unnecessary.

For all of the foregoing reasons, the defendant's motion for a jury view is DENIED.

### Defendant's Motion to Dismiss for Fraud

The defendant seeks dismissal of the Indictment, and by extension the Superseding Indictment, on the ground that a fraud has been perpetrated upon the Court: namely, that evidence has been "switched" in "an attempt to contrive a conviction of an innocent man […]." (Doc No. 65 at 1.) Specifically, the defendant complains that, in the first forensic lab report prepared by a private laboratory at the request of state investigators, glass fragments analyzed from the December 14, 2009 scene of the bombing of the Mansfield City Hall were inconsistent with glass taken from the defendant's shoe. According to the defendant, this initial report had the effect of demonstrating that the defendant could not have been involved in the December 14, 2009 bombing. In contrast, the second report contained additional glass fragments, which analysis of these additional fragments supported a finding that the defendant was

29

involved in the bombing. The defendant calls this a "bait and switch" of evidence, and argues that it amounts to fraud.

The government rejects the defendant's assessment of the investigation, and explains that certain glass fragments were originally submitted for analysis, while others were simply submitted at a later time. It notes that "[w]hile the Defendant sees this as evidence of fraud and conspiracy, the reality is that it is evidence of investigators thoroughly doing their jobs and ensuring that all of the glass fragments collected at the scene were examined and compared with the fragments found on the shoes and sledgehammer." (Doc. No. 72 at 4.)

The Court finds that the defendant is really challenging the chain of custody of this category of evidence, and that such an attack goes to the weight of the evidence and not its admissibility (and certainly not to the propriety of the underlying prosecution). *See United States v. Combs*, 369 F.3d 925, 938 (6th Cir. 2004). Moreover, the mere fact that the government continued to analyze evidence is insufficient to even raise the question of the evidence's admissibility. As the Sixth Circuit has observed:

> Physical evidence is admissible when the possibilities of misidentification or alteration are 'eliminated, not absolutely, but as a matter of reasonable probability.' Merely raising the possibility of tampering is insufficient to tender evidence inadmissible. Where there is no evidence indicating that tampering with the exhibits occurred, courts presume public officers have discharged their duties properly. Absent clear abuse of discretion, 'challenges to the chain of custody go to the weight of the evidence, not its admissibility.'

*United States v. Allen*, 106 F.3d 695, 700 (6th Cir. 1997) (internal citations omitted). Thus, while the defendant may challenge at trial the weight to be afforded this evidence, his unsupported suspicions of tampering cannot serve as the basis for a motion to dismiss

the indictment. *See, generally, United States v. Levy*, 904 F.2d 1026, 1030 (6th Cir. 1990); *United States v. Knowles*, 623 F.3d 381, 386 (6th Cir. 2010). For these reasons, the defendant's motion to dismiss for fraud is DENIED.

### Defendant's Motion to Dismiss on Speedy Trial Grounds

The defendant also insists that the Superseding Indictment must be dismissed because his constitutional and statutory rights to a speedy trial have been violated. In support of this motion, the defendant looks to the fact that he has been held in custody, either state or federal, continuously since December 15, 2009. The defendant was first arrested by state authorities on December 15, 2009, and was indicted by a state grand jury on February 4, 2010. He was not indicted by a federal grand jury until May 18, 2010. The defendant argues that the state prosecution was a mere "ruse" to justify keeping the defendant in custody until federal charges could be filed. He alleges that the government has violated his rights under the Fifth and Sixth Amendments, as well as Rule 48(b) of the Federal Rules of Criminal Procedure and the Speedy Trial Act, 18 U.S.C. § 3161.

It appears from his motion that the focus of his speedy trial argument is 18 U.S.C. § 3161(b), which requires that a person arrested on a federal charge be indicted by a federal grand jury within thirty days of his arrest. It is well settled, however, that the Speedy Trial Act is not triggered until formal *federal* charges are filed. *See United States v. Blackmon*, 874 F.2d 378, 381 (6th Cir. 1989). Moreover, "[r]egardless of the degree of federal involvement in a state investigation and arrest, only a federal arrest initiates the running of the time limitation established by 18 U.S.C. § 3161." *Id. See United States v.*

*Murphy*, 241 F.3d 447, 454 (6th Cir. 2001) ("It is well-established in [the Sixth] Circuit that the thirty-day time limit is not triggered until there is a federal 'arrest.'") An arrest by state officials does not start the thirty-day clock under § 3161(b). *See Murphy*, 241 F.3d at 454. As such, the December 15, 2009 arrest by state officials on state arson charges would not have started the thirty-day clock. Further, because the defendant was not arrested federally prior to his indictment, there could be no violation of 18 U.S.C. § 3161(b).

The defendant argues, however, that the state proceedings were a sham and a mere "ruse" to justify the defendant's continuous detention while federal investigators built their case to present to a federal grand jury. The government acknowledges that there is some support in the case law for the "ruse" exception to the general rule that the thirty-day speedy trial clock begins at the time of a federal arrest. *See United States v. Benitez*, 34 F.3d 1489, 1494 (9th Cir. 1994). It notes, however, that the "ruse" exception will fail where, as here, the state action was commenced in good faith. *See, e.g., United States v. Cepeda-Luna*, 989 F.2d 353, 357-58 (9th Cir. 1993) (recognizing the ruse exception but finding no evidence of ruse or bad faith in relation to civil deportation proceedings).

Here, there is no evidence that the state prosecution was a sham or a ruse. Instead, there is every indication that the state was proceeding in good faith to prosecute the state arson charges against the defendant. The state had sought an indictment by grand jury, the prosecution had complied with state discovery requirements, and the state court permitted the parties to engage in motion practice and had held a suppression hearing. Given the state's posture with respect to the state arson charges, the Court cannot

find support for the defendant's vague suspicion that the state prosecution was a ruse sufficient to defeat the general rule that only a federal arrest may trigger § 3131(b).[15]

The defendant's Fifth Amendment speedy trial claim of pre-indictment delay must fail, as well. Pre-indictment delay violates the Fifth Amendment Due Process Clause only if the defendant can show: (1) "substantial prejudice to his right to a fair trial," and (2) "that the delay was an intentional device by the government to gain a tactical advantage." *United States v. Schaffer*, 586 F.3d 414, 424 (6th Cir. 2009) (internal quotation marks omitted), cert. denied, 130 S. Ct. 1921 (2010).

The defendant has not even alleged, let alone established, the existence of actual prejudice. For this reason alone, his claim must fail. *See Schaffer*, 586 F.3d at 424 (if the defendant cannot prove actual prejudice, the government need not even address whether the delay was an intentional device to gain a tactical advantage).[16] Moreover, the defendant has offered no evidence as to the "tactical advantage" prong of the test.

Likewise, any claim the defendant may have as to a Sixth Amendment violation, or a post-indictment statutory violation, must fail. On July 20, 2010, the defendant filed a motion to continue the trial, which the Court granted on July 22, 2010. On that date, the defendant waived his speedy trial rights. The Court found that the ends of justice served by a continuance outweighed the best interest of the public and the

---

[15] The defendant's reference to *United States v. Orbino*, 981 F.2d 1035 (9th Cir. 1992), and his suggestion that the facts are "somewhat similar" to those present in this case, does nothing to change the Court's conclusion. In *Orbino*, the Ninth Circuit found no evidence of collusion between the Immigration and Naturalization Service (INS) and the federal task force investigating a drug ring of which the defendant was a purported member. *Id.* at 1036. The court reached this conclusion notwithstanding the fact that federal prosecutors kept a "sharp eye" on the INS proceedings. *Id.* at 1037.

[16] In addition, the Indictment was returned within the applicable statute of limitations. "[T]he acceptability of a pre-indictment delay is generally measured by the applicable statute of limitations." *Schaffer*, 586 F.3d at 425 (quoting *United States v. Atisha*, 804 F.2d 920, 928 (6th Cir. 1986)).

defendant in a speedy trial because failure to grant the additional time would deny counsel for the defendant the time reasonably necessary for effective preparation. The Court also declared this case to be complex,[17] pursuant to 18 U.S.C. § 3161(h)(8)(B)(ii), due to the nature of the prosecution and the number of documents involved, and that it was unreasonable to expect adequate preparation for pretrial proceedings and trial within the time limits established. This case was further delayed by the numerous motions filed by the defendant, including several *pro se* motions.[18]

Finally, the defendant cannot rely upon Fed. R. Crim. P. 48 to establish a speedy trial violation. "By its terms, Rule 48 is discretionary and, according to the Reporter's Notes, reflects the inherent power of the courts to dismiss for want of prosecution." *United States v. Ciammitti*, 720 F.2d 927, 929 (6th Cir. 1983) (citing Reporter's Notes to Fed. R. Crim. P. 48). It does not apply generally to pre-indictment delay but only to delay between arrest and indictment. *See United States v. Marion*, 404 U.S. 307, 319 (1971). The defendant was not brought into federal custody until after the return of a federal indictment. As such, he has not demonstrated any unnecessary delay.

Because the defendant cannot establish any speedy trial violations, his motion to dismiss on this ground is DENIED.

---

[17] During a number of pre-trial hearings, the defendant acknowledged that the case was complex and that a continuance would be necessary for effective preparation.

[18] Further delays were occasioned by the defendant's improvident filing of notices of appeal to the Sixth Circuit from several of the Court's non-final orders.

**Conclusion**

For all of the foregoing reasons, the defendant's motions to suppress evidence, motion for a bill of particulars, motion to dismiss the indictment, motion for a jury view, motion to dismiss for fraud, and motion to dismiss on speedy trial grounds are DENIED.

**IT IS SO ORDERED**.

Dated: April 27, 2011

**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**

35